UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MARIE NICOLE MURABITO,

        Plaintiff,

-against-

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

        Defendant.

------------------------------------------------------------X

FILED
CLERK

10/27/2016 4:34 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**OPINION AND ORDER**
15-cv-2807 (SJF)

FEUERSTEIN, District Judge:

        Plaintiff Marie Nicole Murabito ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g) seeking judicial review of the final determination of defendant Carolyn W. Colvin,

Acting Commissioner of Social Security Administration (the "Commissioner"), denying

Plaintiff's applications for disability insurance and supplemental security income benefits.

Before the Court are the Plaintiff's motion for judgment on the pleadings pursuant to Federal Rule

of Civil Procedure 12(c) and the Commissioner's cross-motion for judgment on the pleadings.

For the following reasons, Plaintiff's motion is denied and the Commissioner's cross-motion is

granted.

## I.    BACKGROUND

### A.    Procedural Background

        Plaintiff applied for disability insurance benefits on February 22, 2012 and supplemental

security income on March 5, 2012, alleging a disability onset date of February 1, 2009.

(Transcript of Administrative Record (Dkt. 15, 15-1, 16) ("Tr.") at 151-52, 157-62).   Plaintiff's

alleged disabilities were tendonitis in both ankles, bursitis in her left ankle, severe tendon

problems in her right ankle, attention deficit hyperactivity disorder ("ADHD"), mood swings, high anxiety, a learning disability, osteoporosis, and ulcerative colitis. (Tr. at 10, 151–62, 192).

After her applications were denied, Plaintiff requested a hearing before an administrative law judge, and on October 7, 2013 attended a hearing with her attorney before administrative law judge April M. Wexler (the "ALJ"). (*Id.* at 108–09, 790–832). The ALJ heard testimony from Plaintiff and Walter Manola, a vocational expert. (*Id.* at 790–832). In a written decision dated November 15, 2013, the ALJ concluded that Plaintiff was not disabled under the Social Security Act from February 1, 2009, the alleged onset date, through the date of the decision. (*Id.* at 7–28). A month later, Plaintiff requested review of the ALJ's decision by the Appeals Council. (*Id.* at 6). On March 13, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision denying benefits the final decision of the Commissioner. (*Id.* at 1–4). Plaintiff commenced this action on May 15, 2015. On January 25, 2016, Plaintiff moved for judgment on the pleadings, and on April 11, 2016, the Commissioner filed its cross-motion.

B.      **Non-Medical Evidence**

1.      **Plaintiff's Personal and Employment History**

Plaintiff was born on May 29, 1964. (Tr. 151). At the time of the administrative hearing Plaintiff was forty-nine (49) years old and lived with her three (3) children who have special needs. (*Id.* at 794, 812). She completed high school and attended beauty and business schools in the 1980s. (*Id.* at 193). She has worked as a full-time administrative assistant, a part-time sales associate, and a part-time teacher and lunch aide. (*Id.*). From 2009 through the date of the administrative hearing, Plaintiff was self-employed as a babysitter and as a car pool driver. (*Id.*).

### 2.    Plaintiff's Self-Reporting in Her Social Security Application

On April 11, 2012, Plaintiff completed a function report in support of her application for disability insurance benefits.  (*Id.* at 214–34).   According to the report, she began a typical day getting her three (3) children ready for school.  (*Id.* at 215, 224).   Daily activities included cleaning, vacuuming, grocery shopping, and doing laundry.  (*Id.* at 217–18).   Her children helped her with various chores around the house.  (*Id.* at 217).   She occasionally visited friends, went to church, and attended meetings at her children's school.  (*Id.* at 219).   Plaintiff walked, drove, and used public transportation.  (*Id.* at 217).

Plaintiff reported that ankle pain had negatively impacted her ability to sit, lift, reach, stand, walk, and climb stairs since November 2010.   (*Id.* at 215, 219–20, 222, 224).   She indicated that she could not kneel or squat, and that she had persistent pain in her left ankle and minimal pain in her right ankle.   (*Id.* at 220, 222–23).   Plaintiff used a cane almost all of the time, wore braces on both ankles, and had orthotics for both feet.   (*Id.* at 224).

Plaintiff further reported that she had difficulty concentrating due to ADHD.   (*Id.* at 219, 221).   She was easily distracted, had difficulty following instructions, and had problems with stress and memory.   (*Id.* at 221–22, 225).   Plaintiff indicated that she sometimes spoke in tangents and often avoided social situations.   (*Id.* at 226).   She had been diagnosed with anxiety and ADHD in 2005.   (*Id.* at 224).   She claimed to suffer from anxiety attacks on a daily basis. (*Id.* at 225).

### 3.    Plaintiff's Testimony at the Administrative Hearing

Appearing with counsel, Plaintiff testified that she worked part-time as a babysitter, car pool driver, and dog walker.  (*Id.* at 795).   She stated that she could not work full-time because she had problems concentrating and had been reprimanded at her prior jobs for failing to complete

tasks properly.  (*Id.* at 797).  Despite these issues, she watched one (1) child in the mornings and two (2) children in the afternoon, in addition to her own children.  (*Id.* at 795, 799).  She testified that she forgot to pick up one of the children from school at least once a week due to the child's erratic school attendance, but that the child's parents continued relying on Plaintiff for her services.  (*Id.* at 799–800).  As a dog walker, Plaintiff walked dogs two (2) to three (3) times per week; the dogs' owner(s) contacted her shortly before her services were required, so she never forgot to walk the dogs.  (*Id.* at 801).

Plaintiff testified that she suffered from back pain and shoulder pain, which started three (3) to four (4) weeks before the hearing.  (*Id.* at 798).  She could not lift her arms up, which made showering difficult.  (*Id.*).  She alternated between sitting and standing while cooking. (*Id.* at 825).  She did not take pain medication and stated that a muscle relaxer she had taken in the past made her feel "paralyze[d]."  (*Id.* at 804).

Plaintiff further testified that she suffered from osteoporosis and ulcerative colitis.  (*Id.* at 805–07).  She had ulcerative colitis flare-ups monthly or every other month, which necessitated urgent trips to the bathroom.  (*Id.* at 821).  Flare-ups usually lasted a few days.  (*Id.* at 822).

According to Plaintiff, her conditions caused physical limitations.  (*Id.* at 816–19, 827). She stated that she could sit for ten (10) to fifteen (15) minutes before experiencing back and neck pain, stand for fifteen (15) to twenty (20) minutes, and lift only around five (5) pounds.  (*Id.* at 818–19, 827).  At the hearing, Plaintiff's counsel noted that Plaintiff had been sitting for approximately thirty (30) minutes; Plaintiff acknowledged this but said she felt uncomfortable. (*Id.* at 818).

### 4.       Vocational Expert's Testimony

Walter Manola, a vocational expert, also testified regarding Plaintiff's employment prospects.   (*Id.* at 828–31).   Mr. Manola testified that Plaintiff's prior work as an administrative assistant was classified as "sedentary in terms of the physical demand."   (*Id.* at 828).   He testified that a hypothetical person of similar age, abilities, education, and work history could not perform Plaintiff's past relevant work.   (*Id.* at 829).   However, this hypothetical person could find work as a "document prep worker,"[1] a "table worker,"[2] or an "assembler,"[3] of which there were 200,000, 100,000, and 100,000 such positions available nationwide, respectively, according to Mr. Manola.   (*Id.* at 830).   The ALJ then asked Mr. Manola to assume that this hypothetical person would need to be absent from work three (3) to four (4) times per month.   (*Id.*).   Mr. Manola testified that "[w]ith absences at that frequency, there would be no jobs that one could do in the competitive labor market."   (*Id.* at 831).

---

[1]  According to the Dictionary of Occupational Titles, a document preparer "[p]repares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices."   DICOT 249.587-018, 1991 WL 672349 (G.P.O.).

[2]  A table worker "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard titles."   DICOT 739.687-182, 1991 WL 680217 (G.P.O.).

[3]  The Court notes that the vocational expert cited the assembler position as 703.687-018, but that citation describes a metal-finish inspector.   DICOT 703.687-018, 1991 WL 678969 (G.P.O.).   Nevertheless, an assembler generally "[p]erforms repetitive bench or line assembly operations to mass-produce products, such as automobile or tractor radiators, blower wheels, refrigerators, or gas stoves."   DICOT 706.687-010, 1991 WL 679074 (G.P.O.).

### C. Medical Evidence

#### 1. Dr. Roger Feldman – Treating Psychiatrist

Dr. Feldman, a psychiatrist at the Peninsula Counseling Center,[4] provided various opinions concerning Plaintiff's ADHD, anxiety, and depression. (*Id.* at 760). He evaluated Plaintiff for the purposes of medication management. (*Id.*). Plaintiff saw Dr. Feldman nine (9) times over the course of fourteen (14) months, beginning in August 2012. (*Id.* at 647–49, 692–93, 700–02, 760, 784–89).

In an October 1, 2013 "Medical Assessment of Claimant's Ability to Perform Work Related Activities in a Mental Impairment Claim" form, Dr. Feldman summarized Plaintiff's condition as follows:

> [Plaintiff] has a severe ADHD in addition to mixed anxiety and depression. She has a long history of extreme disorganization, distractibility, impairment in concentration, time management [difficulties], interpersonal difficulties, and [becomes] quickly overwhelmed by stress and multitasking. These [conditions] have interfered with all aspects of her life.

(*Id.* at 785). Dr. Feldman opined that Plaintiff is either markedly impaired or has no useful ability with respect to following work rules, dealing with the public, dealing with work stresses, functioning independently, and maintaining attention or concentration. (*Id.* at 784–85). He indicated that it would be very difficult for Plaintiff to carry out complex job instructions, behave in an emotionally stable manner, and maintain schedules and daily routines. (*Id.* at 786).

Dr. Feldman's notes from prior visits in the months leading up to this conclusion indicate that he did not believe that Plaintiff was depressed and suffered from only mild anxiety. (*Id.* at

---

[4] The ALJ states that Dr. Feldman is a psychiatrist at the Sunrise Counseling Center, (Tr. at 16), but treatment notes indicate that Dr. Feldman worked for the Peninsula Counseling Center. (*Id.* at 647–49, 692–93, 700–02, 760, 784–89).

692, 701–02).  According to Dr. Feldman's prior visit notes, Plaintiff appeared pleasant, articulate, and talkative.  (*Id.* at 692, 702).  His primary diagnosis was ADHD.  (*Id.* at 702).  Although Plaintiff had issues with organization and time management, her judgment was intact, according to Dr. Feldman.  (*Id.*).  Overall, Dr. Feldman observed that Plaintiff's condition had improved as of July 2013, four (4) months before delivering his conclusion that her ADHD was "severe" and that she has a "long history" of various organizational, cognitive, and interpersonal problems.  (*Id.*).

## 2.    Other Psychiatrists

In treatment notes from January 10, 2012, Dr. Rio Sferrazza, a psychiatrist, diagnosed Plaintiff with high anxiety and ADHD, and indicated that Plaintiff would "return if required." (*Id.* at 407-08).  On January 17, 2012, Plaintiff visited Dr. Paul Agnelli, a psychiatrist affiliated with Peninsula Counseling Center, and reported that she was not experiencing any acute symptoms of anxiety.  (*Id.* at 549).  Dr. Agnelli diagnosed her with anxiety disorder, "discussed some ways to manage anxiety symptoms when they occur," and directed Plaintiff to continue attending therapy sessions.  (*Id.*).  Dr. Angelli's notes from a March 13, 2012 visit indicate that Plaintiff's mental condition was stable, that she had "ongoing episodes of anxiety related to home foreclosure," and that she denied a depressed mood and had an appropriate affect.  (*Id.* at 548). Dr. Agnelli again discussed ways to manage her anxiety and directed her to continue attending therapy.  (*Id.*).  In a February 29, 2012 letter to the Social Security Administration, Dr. Leonard Adler, a psychiatrist affiliated with NYU School of Medicine, indicated that he had "evaluated [Plaintiff] … and diagnosed her with [ADHD]" and that she was being treated with Buspirone and Bupropion (anxiety and depression medications) and would continue to see him for "monthly medication management sessions."  (*Id.* at 544).  Dr. Adler did not note any occupational

limitations.  (*Id.*).  Dr. Adler's report was the same in a May 2, 2012 letter to the Social Security

Administration apart from adding that he had also prescribed Plaintiff Abilify (an antipsychotic

medication used to treat bipolar disorder and depression).  (*Id.* at 559).[5]

### 3. Dr. David Goddard – Treating Physician

On March 2, 2011, Dr. David Goddard, a rheumatologist and Plaintiff's treating physician,

saw Plaintiff "after a long absence."  (*Id.* at 353).  He reported that Plaintiff had ulcerative

colitis, but had not experienced any flare-ups.  (*Id.* at 353).  Dr. Goddard's assessment of

Plaintiff's ulcerative colitis was later validated by Dr. Stephen Siegel, a gastroenterologist, who,

during an appointment on March 11, 2013, diagnosed Plaintiff with "inactive colitis."  (*Id.* at

682).

Dr. Goddard also noted that Plaintiff had osteoporosis and progressive pain and swelling

of her left ankle.  (*Id.* at 353).  Physical examination revealed that Plaintiff's shoulders, elbows,

wrists, hands, spine, hips, knees, ankles, and feet were all normal.  (*Id.* at 354–55).  He noted

that her ankle arthritis was consistent with colitic arthritis, and that her bone density was stable

and consistent with osteoporosis at the lumbar spine.  (*Id.* at 355).  Dr. Goddard ordered an MRI

of Plaintiff's left ankle, which revealed "marked posterior tibialis tendinosis" and suggested tarsal

tunnel syndrome.  (*Id.* at 312).  Dr. Goddard also ordered an MRI of Plaintiff's lumbosacral

spine, which revealed narrowing of disc space heights at L1-L2 and L5-S1, and certain other

degenerative changes, but no evidence of any acute fractures or dislocations.  (*Id.* at 314).

---

[5] The record also contains illegible treatment notes from Dr. Adler.  (*See id.* at 560-63).

### 4.      Dr. Michael DellaCorte – Podiatrist

On January 21, 2011, Plaintiff began seeing Dr. Michael DellaCorte, a podiatrist, to address tendonitis in her left ankle.   (*Id.* at 367).   He prescribed an elastic "Richie" (a brand name) brace for her left ankle and injected the left ankle with cortisone to alleviate pain.   (*Id.*).   One month later, Plaintiff complained of pain in both ankles, which prompted Dr. DellaCorte to prescribe a Richie brace for Plaintiff's right ankle.   (*Id.* at 363).   In April 2011, Dr. DellaCorte observed that Plaintiff was unable to walk without her braces but was "doing much better."   (*Id.* at 413).   Nevertheless, Plaintiff sometimes did not wear the braces as prescribed because they were painful.   (*Id.* at 361, 411).

### 5.      Dr. Neil Watnik – Orthopedist

During an April 20, 2011 consultation, Dr. Neil Watnik, an orthopedist, noted that Plaintiff's left ankle "[p]ain occurs primarily with weight-bearing" but that she "has had some mild relief" with bracing, physical therapy, and medication.   (*Id.* at 277).   She had no numbness or tingling in her toes.   (*Id.*).   Previously, Dr. Watnik had found fluid build-up in the tendon sheath.   (*Id.* at 275).   For the next few months, Plaintiff "report[ed] slow but steady improvement."   (*Id.* at 281, 554).   During April 2012 and February 2013 consultations, Plaintiff's pain persisted after she had stopped physical therapy, and she appeared to develop issues with her right ankle.   (*Id.* at 556, 628, 670).   Plaintiff nonetheless maintained a full range of motion with mild discomfort.   (*Id.* at 670).

### 6. Dr. Craig Radnay – Orthopedist

Dr. Watnik requested the consultation of Dr. Craig Radnay, another orthopedist, who examined Plaintiff on April 3, 2013. (*Id.* at 687–88). Dr. Radnay noted that Plaintiff had "progressive foot and ankle pain bilaterally," which was "exacerbated with increased weight bearing and standing." (*Id.* at 687). Physical examination revealed that: Plaintiff ambulates with a mildly antalgic gait; her hindfoot was in significant valgus alignment; she was very weak to distal plantar flexion; she was unable to toe-heel raise while standing on one leg; and she was very tender along the course of the posterior tibial tendon. (*Id.* at 688). Dr. Radnay recommended that Plaintiff use "more formal bracing or consider likely flexible flatfoot reconstruction" and physical therapy focused on foot ankle strength and stabilization. (*Id.*).

### 7. Dr. Ammaji Manyam – Consultative Examiner

On May 9, 2012, Dr. Ammaji Manyam, an internist associated with Industrial Medical Associates, PC, conducted a one-time internal medicine examination at the request of the Social Security Commissioner. (*Id.* at 571–74). At that time, Plaintiff's chief complaints were "chronic pain in the left ankle and difficulty walking, ADHD, mood disorder, and high anxiety." (*Id.* at 571). Plaintiff reported that she had intermittent pain in her left foot and ankle that was alleviated by pain medications. (*Id.*). Plaintiff told Dr. Manyam that she cooked, cleaned, did laundry, played sports, showered, bathed, and dressed herself, and that she was self-employed as a babysitter and as a car pool driver. (*Id.* at 571-72). Dr. Manyam opined that Plaintiff "appeared to be in no acute distress" but used braces on both feet for stabilization. (*Id.*). Plaintiff could stand normally, squat fully, walk on her heels and toes without difficulty, change for the examination without assistance, and rise from a chair without difficulty. (*Id.*). She had a full range of motion of her cervical spine and lumbar spine. (*Id.* at 573). Her joints were stable, her

reflexes were normal, and her hand and finger dexterity was intact. (*Id.*). Her muscle and grip strength were normal. (*Id.*). Based on these observations, Dr. Manyam concluded that Plaintiff had "mild limitations to prolonged standing, walking, and climbing stairs." (*Id.* at 574).

Dr. Manyam's conclusion was consistent with subsequent examinations by other doctors. In March 2013, a rheumatologist observed, among other things, that Plaintiff was "[n]ot in acute distress" and had "[n]o morning stiffness, muscle weakness, or muscle tenderness." (*Id.* at 685–86). Four (4) months later, a scoliosis specialist examined Plaintiff, noting that she suffered most from lower back pain. (*Id.* at 772). The specialist did note that sitting, walking, carrying, and lifting exacerbated Plaintiff's condition and recommended further evaluation of the lumbar spine with an MRI. (*Id.*). However, the examination also revealed that: (i) Plaintiff's gait was normal; (ii) her heel and toe walk was intact; (iii) she could flex forward with some discomfort; (iv) her motor, sensory, and reflex examination of the lower extremities was intact; and (v) her hips were pain-free with a full range of motion. (*Id.*).

### 8.     Dr. John Laurence Miller – Consultative Examiner

On May 9, 2012, Dr. John Laurence Miller, a clinical psychologist associated with Industrial Medicine Associates, PC, conducted a one-time psychiatric evaluation at the request of the Social Security Administration. (*Id.* at 567–70). Dr. Miller noted that Plaintiff drove herself to the examination and worked part-time. (*Id.* at 567). Her daily activities included cooking, cleaning, reading, shopping, watching television, listening to the radio, and visiting family and friends. (*Id.* at 569). Plaintiff appeared to be "[c]oherent and goal-directed with no evidence of hallucinations, delusions or paranoia in the evaluation setting." (*Id.* at 568). Plaintiff was fully oriented, and her attention, concentration, and memory skills were intact. (*Id.* at 569). Plaintiff's insight and judgment were also good. (*Id.*). Her "[i]ntellectual functioning appeared

to be average," and her "[g]eneral fund of information appeared to be appropriate to experience." (*Id.*).

Dr. Miller opined that Plaintiff appeared to have difficulties relating to others and dealing with stress, but that she could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, and make appropriate decisions. (*Id.* at 569–70). Dr. Miller diagnosed Plaintiff with major depressive disorder, the symptoms of which were effectively controlled by medication. (*Id.* at 570).

**D.      The ALJ's Decision**

The ALJ employed the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 (*see infra*), found that Plaintiff was "not disabled" within the meaning of the Social Security Act, and denied her request for disability benefits. (*Id.* at 20). The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since February 1, 2009, the alleged onset of her disability. (*Id.* at 12). At the second step, the ALJ found that Plaintiff had the following severe impairments: left ankle tendonitis, right ankle arthritis, osteoporosis, degenerative disc disease of the lumbar spine, ulcerative colitis, and ADHD. (*Id.*). At the third step, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or equals the medical criteria of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 13). At the fourth step, the ALJ observed that Plaintiff could not perform her past relevant work as an administrative assistant. (*Id.* at 19). At the fifth and final step, the ALJ determined that Plaintiff retained the ability to work in a range of sedentary work:

> [S]he can occasionally lift ten pounds, sit for approximately six hours and stand and/or walk for approximately two hours in an eight-hour workday with normal breaks; occasionally climb ramps or stairs but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; push/pull limited to the amount of lifting and carrying but must avoid concentrated

> exposure to hazards such as moving machinery and heights and
> needs ready access to a restroom; she is limited to simple routine
> tasks involving no more than simple, one-or-two step instructions
> and simple work-related decisions with few workplace changes, low
> stress jobs, which means no work at fixed production rate pace,
> with work that is checked at the end of the workday or workweek
> rather than hourly or throughout the day, with only occasional
> contact with members of the general public, co-workers or
> supervisors.

(*Id.* at 14).   In reaching this conclusion, the ALJ relied on the vocational expert's testimony to

conclude that Plaintiff could perform jobs that exist in significant numbers in the national

economy.   (*Id.* at 20).   As discussed above, such jobs included document preparer, table worker,

and assembler.   (*Id.*).   Thus, the ALJ determined that Plaintiff was not disabled.   (*Id.*).

## II.   DISCUSSION

### A.   Standards of Review

#### 1.   Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are

closed – but early enough not to delay trial – a party may move for judgment on the pleadings."

Fed. R. Civ. P. 12(c).   The standard applied to a motion for judgment on the pleadings is the

same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.   *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).   To

survive such a motion, "a complaint must contain sufficient factual matter. . . to state a claim to

relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotations omitted).   The court must accept all well-pleaded factual allegations in the complaint

as true and draw all reasonable inferences in favor of the non-moving party.   *Id.* at 679.   The

court is limited "to facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

### 2.    Review of Determinations by the Commissioner

A court reviewing the final decision of the Commissioner may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).   A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)).   "[I]t is not the function of the reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).   "[S]ubstantial evidence is more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotations and citations omitted).   "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id*. (internal quotations and citations omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).   Courts must ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004).   If a court finds that the Commissioner has failed to apply the correct

legal standards, the court must determine whether the "error of law might have affected the disposition of the case." *Id.* at 189. If so, the Commissioner's decision must be reversed. *Id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

## B. Evaluation of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

Social Security Act regulations require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b).

15

"Substantial work activity … involves doing significant physical or mental activities."   20 C.F.R. § 416.972(a).   "Gainful work activity … is the kind of work usually done for pay or profit, whether or not a profit is realized."   20 C.F.R. § 416.972(b).   If a claimant is doing "substantial gainful activity," the claimant is not disabled.   20 C.F.R. § 404.1520(a)(4)(i) and (b).   If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement."   20 C.F.R. § 404.1520(a)(4)(ii).   An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. § 404.1520(c).   To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months."   20 C.F.R. § 404.1509.   The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii).   If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled.   20 C.F.R. § 404.1520(d).   If the Commissioner does not determine that the claimant is disabled at the third

step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a). In determining a claimant's RFC, the ALJ considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, the claimant is not disabled. *Id.* If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving the first four (4) steps of the sequential analysis, and the burden shifts to the Commissioner at the final step. *See Talavera*, 697 F.3d at 151.

## C. Application

Plaintiff argues that: (i) the ALJ violated the "treating physician rule" when she accorded "very little weight" to the October 2013 opinion of Dr. Feldman, Plaintiff's psychiatrist (*see* Pl. Br. (Dkt. 10) at 11–14); and (ii) the ALJ's RFC finding is not supported by substantial evidence

(*see id.* at 14–16).   In defending the ALJ's decision, the Commissioner argues the opposite.   (*See* Def. Br. (Dkt. 14) at 22–29).

## 1.        The Treating Physician Rule

Plaintiff's argument that the ALJ violated the "treating physician rule" is without merit. (*See* Pl. Br. at 11–14).   Under the treating physician rule, a treating source's opinion is generally entitled to "'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"   *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).   In conducting this analysis, the ALJ must provide "good reasons" for adopting or rejecting a treating physician's opinion.   20 C.F.R. § 404.1527(c)(2); *see also Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) ("A claimant . . . who knows that her physician has deemed her disabled[ ] might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied").   The failure to provide good reasons for rejecting a treating source's opinion is a ground for remand.   *Burgess*, 537 F.3d at 129–30.

If an ALJ does not accord controlling weight to a treating source's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion."   *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal citation omitted); *see also Schnetzler v. Astrue*, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008).   These factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.

*Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 203 (S.D.N.Y. 2010) (citing 20 C.F.R. § 404.1527(c)(1)–(6)).  But the Second Circuit has made clear that the ALJ need not "slavish[ly] recit[e] … each and every factor where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *see also Khan v. Astrue*, No. 11-CV-5118 (MKB), 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013).  The ALJ need only apply "the substance of the treating physician rule."  *Halloran*, 362 F.3d at 32.  In *Halloran*, for example, "it [was] unclear on the face of the ALJ's opinion whether the ALJ considered (or even was aware of) the applicability of the treating physician rule," but the Second Circuit upheld the ALJ's opinion because "the substance of the treating physician rule was not traversed."  *Id.* at 32.

The ALJ adequately adhered to the treating physician rule.  The ALJ observed that Dr. Feldman is a psychiatrist at the Peninsula Counseling Center who treated Plaintiff "only for medication management," thus considering Dr. Feldman's specialization and the nature of the treatment relationship.  (Tr. at 18, 647–49, 692–93, 700).  The ALJ referred to Dr. Feldman's treatment notes and cited an exhibit indicating that Dr. Feldman had treated Plaintiff approximately nine (9) times over a fourteen (14)-month period, thus considering the length and frequency of the treatment relationship.  (*Id.* at 18, 647–49, 692–93, 700–02, 760, 784–89).  Finally, the ALJ considered whether Dr. Feldman's report was supported by / consistent with other evidence in the record, concluding that his dire October 2013 opinion concerning Plaintiff's mental health was inconsistent with his own prior treatment notes, among other things.  (*Id.* at 18); *see Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) ("Because [the doctor's] medical source statement conflicted with his own treatment notes, the ALJ was not required to afford his opinion controlling weight.").  For example, just four (4) months before issuing his October 2013

report, Dr. Feldman noted that Plaintiff's mental state had improved with medication, and on occasions prior to that indicated that Plaintiff was not depressed and was suffering from only mild anxiety. (Tr. at 692–93, 702).

Additionally, Plaintiff's own account of her daily activities undermine Dr. Feldman's October 2013 report and bolster his earlier treatment notes and the ALJ's conclusion that Plaintiff was not disabled during the relevant time period. *See Fleming-Hogan v. Colvin*, No. 14-cv-1891, 2015 WL 9462107, at *7 (E.D.N.Y. Dec. 28, 2015) (the ALJ's decision did not violate the treating physician's rule where the treating physician's "opinion was inconsistent with . . . Plaintiff's own admissions regarding her capabilities"). Her professed daily activities – cooking, cleaning, walking / exercising, grocery shopping, doing laundry, and driving her children and other people's children to and from school – refute Dr. Feldman's assessment that Plaintiff suffered from extreme limitations as a result of impaired mental health. (Tr. at 18–19, 794–96, 806–12); *see Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (substantial evidence supported ALJ's decision opposing treating source where there was evidence that, *inter alia*, the claimant took care of his one-year-old child, vacuumed, washed dishes, watched television, read, used the computer, and drove occasionally).

In arguing that the ALJ violated the treating physician rule, Plaintiff invokes *Baybrook v. Chater*, 940 F. Supp. 668, 674 (D. Vt. 1996). However, in that case the ALJ utterly failed to explain why he rejected the treating physician's opinion, summarily stating:

> [Plaintiff's] treating physician … reports that plaintiff's back pain is disabling. I do not entirely credit his opinion for several reasons and conclude that even after affording it extra weight in the face of contradictory medical and testimonial evidence it is not binding pursuant to *Schisler vs. Bowen*.

*Id.* (internal citation and alterations omitted). By contrast, the ALJ here attached "very little

weight" to Dr. Feldman's restrictive October 2013 opinion because he, among other things, "apparently sees the claimant only for medication management," and his assessment was undermined by his own prior treatment notes, treatment notes of other psychiatrists, progress reports from the Peninsula Counseling Center, and Plaintiff's testimony and statements regarding her daily activities. (*Id.*)

Plaintiff's reliance on *Thorington v. Shalala*, 880 F. Supp. 995, 1002–03 (W.D.N.Y. 1994), is also unavailing. In that case the claimant's treating physician provided reports from a three (3)-year period detailing the claimant's constant pain and minimal improvement. *Id.* at 1003. In a letter to the ALJ, the treating physician explicitly noted that "it would be very difficult for [the claimant] to engage in substantial gainful activity of any type." *Id.* Despite this clear statement, years' worth of medical records in support of that statement, and almost no evidence to the contrary, the ALJ concluded that the claimant was capable of performing a full range of sedentary work activities. *Id.* In Plaintiff's case the ALJ followed the treating physician rule, addressing each factor from 20 C.F.R. § 404.1527(c), and her reasons for attributing little weight to Dr. Feldman's October 2013 opinion were unambiguous. *Cf. Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (remanding the case because the ALJ did not make any "'express, implied, or even oblique reference to the treating physician rule'") (quoting *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986)).

Plaintiff also argues that the ALJ erred in rejecting Dr. Feldman's October 2013 opinion without "mak[ing] an affirmative inquiry of the treating physician seeking the supporting data" by way of subpoena. (Pl. Br. at 13-14). In this regard, Plaintiff relies on *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), for the proposition that the ALJ must seek additional information when she "perceives inconsistencies in a treating physician's report," and other similar

cases that generally say the ALJ must try to develop an incomplete medical record. (*See* Pl. Br. at 13-14). It is true that, given the non-adversarial nature of administrative proceedings, the ALJ has a duty to develop the record. *See, e.g.*, *Saviano v. Chater*, 956 F. Supp. 1061, 1067 (E.D.N.Y. 1997); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). But the ALJ is not required to "resolve every inconsistency and ambiguity in the record." *Bluvband v. Hecker*, 730 F.2d 886, 892 (2d Cir. 1984), *superseded by statute on other grounds as recognized in Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); *see also Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (internal quotation omitted). In this case, there is no indication that Plaintiff's voluminous medical record is incomplete and there are no obvious gaps. The ALJ simply decided to accord little weight to Dr. Feldman's restrictive October 2013 opinion because it was inconsistent with other medical records, including his own prior treatment notes. The ALJ had no obligation to subpoena Dr. Feldman or to otherwise seek more information from him. *See Vanterpool v. Colvin*, No. 12-cv-8789, 2014 WL 1979925, at *17 (S.D.N.Y. May 15, 2014) ("Because the ALJ did not reject [the treating physician's] opinion due to gaps in the record, he was not required to contact the physician for further information or clarification.").

In sum, it is the role of the ALJ to "weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). The

ALJ did this and rendered her decision in accordance with the treating physician rule.

## 2. Substantial Evidence

Plaintiff argues that the ALJ's decision improperly rests on "her distorted interpretations of the reports offered by the Plaintiff's treating physicians and of Plaintiff's testimony as to her physical capabilities," as well as "the opinion of the consultative medical examiner, Dr. Manyam, a physician hired by the Social Security Administration to examine the Plaintiff on one single occasion." (Pl. Br. at 14). In short, Plaintiff argues that the ALJ's conclusion that Plaintiff retains the RFC to perform some sedentary jobs (and is thus not disabled) is not supported by substantial evidence. (*See* Pl. Br. at 14-16).

ALJ's may consider a consultative examiner's opinion in light of the entire record and deem the opinion "substantial evidence" so long as it is supported by other medical evidence in the record. *See, e.g., Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("[T]he report of a consultative physician may constitute [substantial] evidence."). The ALJ afforded "great weight" to the opinions of two consultative examiners, Drs. Manyam and Miller, "due to the thoroughness of their examinations." (Tr. at 18). Dr. Manyam recognized that Plaintiff had physical ailments but ultimately concluded that Plaintiff had only "mild limitations to prolonged standing, walking, and climbing stairs." (Tr. at 571–74). As noted by the ALJ, Dr. Manyam's examination findings were consistent with other treatment records, including those of Dr. Watnik, and the opinions of a scoliosis specialist, a rheumatologist, and an orthopedist. (Tr. at 18). Similarly, Dr. Miller's opinion that Plaintiff had the mental and emotional wherewithal to follow directions, perform simple tasks, and make appropriate decisions, and that her anxiety and depression could be effectively managed with medication, was in accord with Dr. Feldman's pre-October 2013

treatment notes (particularly the July 2013 notes indicating that her condition was improving), treatment notes from Dr. Agnelli, and Plaintiff's self-reporting. Accordingly, the ALJ properly credited Drs. Manyam's and Miller's opinions.

Plaintiff also argues that the ALJ failed to afford appropriate deference to treatment notes from Drs. DellaCorte, Watnik, and Radnay. (*See* Pl. Br. at 16). Plaintiff cites treatment notes showing that: (i) Dr. DellaCorte "has been treating [Plaintiff's ankles] with injections and … 'Richie' brace[s]"; (ii) Dr. Watnik's initial consultation on April 20, 2011 revealed "Hindfoot valgos [sic] with forefoot AB duction [sic], tenderness, swelling, positive too many toe sign and pain with toe raise of the left foot"; and (iii) Dr. Radnay "found antalgic gait, weakness, tenderness and the inability to heel raise." (Pl. Br. at 16). The Social Security regulations direct ALJs to assign weight to medical *opinions*, not to a hodgepodge of treatment notes. *See, e.g.,* 20 C.F.R. §§ 404.1527(2)(b), (c), (d), and (e). None of these doctors offered opinions regarding Plaintiff's overall physical capabilities or how her various ankle / foot ailments might impact her ability to perform daily activities, nor does Plaintiff make any attempt at explaining, and it is far from self-evident that Richie braces, ankle tenderness, "positive too many toe sign," or an antalgic gait prevents someone from performing sedentary work. A more reasonable conclusion is that such conditions impose "mild limitations [with] prolonged standing, walking, and climbing stairs," as Dr. Manyam concluded. Accordingly, this argument is without merit, and the Court finds that the ALJ's determination is supported by substantial evidence.

**III.    CONCLUSION**

For the foregoing reasons, the Commissioner's cross-motion for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted, and the

Plaintiff's motion is denied.    The Clerk of the directed to close this case.


**SO ORDERED.**


                                        *s/ Sandra J. Feuerstein*
                                        Sandra J. Feuerstein
                                        United States District Judge


Dated:    October 27, 2016
              Central Islip, New York